UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

CHEYENNE RIVER SIOUX TRIBE;              )
CROW CREEK SIOUX TRIBE;                  )
LOWER BRULE SIOUX TRIBE;                 )
OGLALA SIOUX TRIBE;                      )         Case No. 5:26-cv-5051
SANTEE SIOUX TRIBE;                      )                   _____
SISSETON-WAHPETON OYATE;                 )
SPIRIT LAKE SIOUX TRIBE;                 )
STANDING ROCK SIOUX TRIBE;               )
and YANKTON SIOUX TRIBE,                 )      **COMPLAINT FOR VACATUR AND**
                                         )        **EQUITABLE, DECLARATORY,**
         Plaintiffs,                     )         **AND INJUNCTIVE RELIEF**
                                         )
v.                                       )
                                         )
UNITED STATES FOREST SERVICE;            )
U.S. DEPT. OF AGRICULTURE;               )
and JAMES GUBBELS, District Ranger,      )
                                         )
         Defendants.                     )

## <u>INTRODUCTION</u>

1.      Plaintiffs Cheyenne River Sioux Tribe, Crow Creek Sioux Tribe, Lower Brule

Sioux Tribe, Oglala Sioux Tribe, Santee Sioux Tribe, Sisseton-Wahpeton Oyate, Spirit Lake

Sioux Tribe, Standing Rock Sioux Tribe, and Yankton Sioux Tribe (collectively "Plaintiff

Tribes") file this suit for vacatur and equitable, declaratory, and injunctive relief under the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, the National Environmental Policy

Act ("NEPA"), 42 U.S.C. § 4321, *et. seq.*, the National Historic Preservation Act ("NHPA"), 54

U.S.C. § 300101, *et seq.*, and their implementing regulations and policies, challenging the

decision of the United States Department of Agriculture's Forest Service ("USFS") to approve

the Pete Lien and Sons Rochford Mineral Exploratory Drilling Project ("Project"), a large

mineral exploration drilling project on National Forest Service ("NFS") lands in the Black Hills,

1

which are known to Plaintiff Tribes as *Ȟe Sápa* or *Pahá Sápa*, and directly affecting *Pe'Sla*, a recognized sacred site and ongoing place of ceremony for Native people in the heart of *Ȟe Sápa*.

2. Defendant USFS approved the Project through a Decision Memo ("Decision") issued by USFS Mystic District Ranger James Gubbels on February 27, 2026.

3. The Decision authorizes Pete Lien and Sons, Inc. ("PLS") to conduct extensive exploratory drilling for graphite, road construction and reconstruction, reclamation, and other ground-disturbing operations on public lands in the Black Hills National Forest, including lands in and adjacent to *Pe'Sla*.

4. The Project will directly and significantly affect *Ȟe Sápa* and *Pe'Sla* and the use of those sacred sites for traditional, cultural, and religious purposes by Plaintiff Tribes and their members.

5. Before approving the Project, the USFS failed to engage in meaningful, mutual, and legally required government-to-government consultation with Plaintiff Tribes, as required by federal law, including the NHPA and its implementing regulations at 36 C.F.R. Part 800, NEPA and its implementing regulations, Executive Order 13,007 (May 24, 1996), and Executive Order 13,175 (Nov. 6, 2000).

6. The USFS failed to include *Pe'Sla* in the area of potential effects for its required analysis, government-to-government consultation with Plaintiff Tribes, and findings regarding affected historic properties under the NHPA. Its conclusion that no historic properties will be affected by the Project was factually incorrect, arbitrary, capricious, and contrary to law.

7. The USFS categorically excluded the Project from the proper environmental, public, and cultural resources review required by NEPA. The USFS relied on a Categorical Exclusion ("CE") for short-term mineral investigations that will last one year or less. This was

2

arbitrary, capricious, and contrary to law, since by the agency's own admission, the Project will last more than one year and since NEPA and its implementing regulations prohibit the use of a CE when "extraordinary circumstances" are present, including significant impacts to recognized American Indian sacred sites.

8.    Plaintiff Tribes ask this Court to declare that the Decision violates federal law, vacate and remand the Decision to the USFS, and enjoin any construction, operation, or development of the Project until the violations have been corrected.

## JURISDICTION AND VENUE

9.    Plaintiff Tribes bring this suit pursuant to the APA, NEPA, NHPA, and federal regulations and policies.

10.    Jurisdiction over this action is conferred by 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief), and 2202 (injunctive relief).

11.    Venue is proper in the District of South Dakota pursuant to 28 U.S.C. §1391(b) and (e).  The USFS Mystic District Office, and named Defendant James Gubbels, who issued the Decision approving the Project, are located in Rapid City, South Dakota.  The Project is located in Pennington County, South Dakota.  Plaintiff Tribes are located in South Dakota, North Dakota, and Nebraska.

## PARTIES

12.    Plaintiffs Cheyenne River Sioux Tribe, Crow Creek Sioux Tribe, Lower Brule Sioux Tribe, Oglala Sioux Tribe, Santee Sioux Tribe, Sisseton-Wahpeton Oyate, Spirit Lake Sioux Tribe, Standing Rock Sioux Tribe, and Yankton Sioux Tribe are federally recognized Indian tribes and *Lakota, Nakota,* and *Dakota* tribes of the *Oceti Sakowin*, or Seven Council Fires of the Great Sioux Nation.

3

13.    Defendant USFS is an agency of Defendant United States Department of Agriculture ("USDA").  The USFS has oversight responsibility for the federal lands affected by the Project.

14.    At all times relevant to this action, Defendant USFS acted on its own behalf and on behalf of Defendant USDA.

15.    Defendant James Gubbels, the District Ranger for the USFS Mystic Ranger District, is the Authorized Officer for the challenged Decision, Project approvals, and related federal actions. He is sued in his official capacity.

<u>**FACTS COMMON TO ALL COUNTS**</u>

### *Ȟe Sápa* **and** *Pe'Sla*

16.    Plaintiff Tribes reserved their original homelands through treaties with the United States, including the Fort Laramie Treaty of 1851, 11 Stat. 749 (Sept. 17, 1851), which was signed by representatives of the several Plaintiff Tribes, and the Treaty of 1868 with the Great Sioux Nation, 15 Stat. 635 (Apr. 29, 1868) ("Treaty of 1868"), which was signed by representatives of all Plaintiff Tribes.

17.    *Ȟe Sápa* and *Pe'Sla* are within the territory "set apart for the absolute and undisturbed use and occupation" of Plaintiff Tribes and the Great Sioux Nation as a "permanent home" in the Treaty of 1868. Treaty of 1868 arts. II, VI, XV, 15 Stat. at 636, 637, 640.

18.    Plaintiff Tribes consider *Ȟe Sápa* to be a sacred site and "the heart of everything that is."

19.    Plaintiff Tribes and their members use and value the lands at *Ȟe Sápa*, including the lands affected by the Project, for traditional, cultural, and religious practices. Those uses will be significantly and irreparably harmed by the Project.

4

20.     The USDA and USFS recognize "the traditional indigenous cultural and historical Great Sioux Nation (Lakota, Nakota, Dakota Oyate) connections to the Black Hills National Forest," and have agreed to "to support consultation and increased cooperation and collaboration related to cooperative planning, land and waters conservation, climate protection and remediation, protection of cultural resources and sacred sites, stewardship, fuel reduction, wildfire management, habitat improvement for wildlife benefit, invasive species intervention, wilderness preservation, sustainable use of natural resources, youth programs, workforce development, protecting sacred sites, enhancing visitor relations and supporting of cultural and historical interpretation in and concerning the Black Hills National Forest." Memorandum of Understanding Between Great Sioux Nation Tribes (Cheyenne River Sioux Tribe, Crow Creek Sioux Tribe, Flandreau Santee Sioux Tribe, Lower Brule Sioux Tribe, Oglala Sioux Tribe, Rosebud Sioux Tribe, Santee Sioux Tribe of Nebraska, Sisseton-Wahpeton Oyate, Standing Rock Sioux Tribe, Spirit Lake Sioux Tribe, and Yankton Sioux Tribe) and the USDA, Forest Service, Rocky Mountain Region, Black Hills National Forest, FS Agreement No. 24-MU-11020300-045 at 1 (Aug. 22, 2024) ("Great Sioux Nation Tribes-USFS MOU").

21.     Plaintiff Tribes consider *Pe'Sla* to be one of the most precious sacred sites in the heart of *Ȟe Sápa*. It is in the middle of the place where Plaintiff Tribes originated, and it is central to their existence. *Pe'Sla* is home to hundreds of cultural properties and numerous historic sites, archeological sites, cultural sites, and Traditional Cultural Properties ("TCP's").

22.     Several Plaintiff Tribes and other Sioux tribes own the land at *Pe'Sla*.

23.     In 2012, Plaintiffs Crow Creek Sioux Tribe and Standing Rock Sioux Tribe and two other Sioux tribes purchased approximately 2,022.66 acres of land within *Pe'Sla*.  In 2016,

the United States, acting by and through the Secretary of the Interior, took these lands into trust for the benefit of the four tribes.

24.    In 2015, Plaintiffs Cheyenne River Sioux Tribe, Oglala Sioux Tribe, Sisseton-Wahpeton Oyate, and Yankton Sioux Tribe, and one other Sioux tribe purchased an additional 437 acres of land, more or less, at *Pe'Sla*. These lands are held in fee by the Shakopee Mdewakanton Sioux Community for the benefit of all five tribes.

25.    In 2018, Plaintiff Crow Creek Sioux Tribe purchased an additional 175 acres of lands, more or less, at *Pe'Sla.* These lands are held in fee by Plaintiff Crow Creek Sioux Tribe.

26.    Altogether, Plaintiff Tribes and other Sioux tribes own 3,634.66 acres of land, more or less, at *Pe'Sla*.

27.    Plaintiff Tribes and the other Sioux tribes have kept all tribal lands at *Pe'Sla* in their original and natural state, reintroducing buffalo and other natural species, and preserving and using the lands for traditional, cultural, and religious practices and ceremonies, which take place on a regular basis.

28.    Plaintiff Tribes and their members use and value the lands at *Pe'Sla* for traditional, cultural, and religious purposes, including prayer, ceremonies, cultural activities, and traditional youth camps. They have participated, and continue to participate, in the return of buffalo and traditional, cultural, and religious activities at *Pe'Sla*, including *inipi* sweat lodge ceremonies, prayer and pipe ceremonies, naming ceremonies, traditional youth camps, traditional youth instruction, including instruction on *Lakota, Nakota,* and *Dakota* language, music, and values, convocations of Great Sioux Nation tribes with traditional council tipis and the convening of chiefs, traditional and cultural leaders, and medicine men, cultural surveys and reviews by Tribal Historic Preservation Officers ("THPO's"), grazing and pasturing of buffalo to

preserve the buffalo genome, buffalo round ups, the performance buffalo songs and buffalo dances, horseback riding, the repatriation of headdresses and cultural items, ceremonial fires, songs, gatherings, and meals, among other things. Those uses will be significantly and irreparably harmed by the Project.

29.    *Pe'Sla* is recognized as an indigenous sacred site, with important religious and cultural significance, by Plaintiff Tribes, other Indian tribes, the federal government, the State of South Dakota, and Pennington County.

30.    In 2024, the USFS committed to work with Great Sioux Nation tribes to protect *Pe'Sla*, including a 2-mile-wide radius surrounding *Pe'Sla*. Great Sioux Nation Tribes-USFS MOU, FS Agreement No. 24-MU-11020300-045 at 6.

31.    The 2-mile-wide radius surrounding *Pe'Sla* is depicted in a map agreed upon by the parties to the Great Sioux Nation Tribes-USFS MOU and appended thereto. Great Sioux Nation Tribes-USFS MOU, FS Agreement No. 24-MU-11020300-045 at Appendix A. The map is attached hereto as **Exhibit A** and incorporated herein by reference.

**The Proposed Mineral Exploration Project and the
USFS's Failure to Consult with Plaintiff Tribes**

32.    On or about June 11, 2024, PLS submitted a proposed Plan of Operations ("PoO") for the Project in which PLS proposed to conduct exploratory drilling for graphite, road construction and reconstruction, reclamation, and other operations on public lands in *Ȟe Sápa* near Rochford, South Dakota.

33.    The Project area, mining claims, and proposed drilling locations are in close proximity to *Pe'Sla*. The mining claim boundaries, drill core locations, and their proximity to *Pe'Sla* are shown in a map prepared by the USFS, which is attached hereto as **Exhibit B** and incorporated herein by reference.

34.    Plaintiff Tribes submitted comments on the Project to the USFS, including comments in response to a USFS scoping notification letter.

35.    Plaintiff Tribes informed the USFS that the Project would directly and significantly affect *Ȟe Sápa* and *Pe'Sla*, including historic, archaeological, and cultural sites at *Ȟe Sápa* and *Pe'Sla*, the lands, water, natural resources, and fish and wildlife at *Ȟe Sápa* and *Pe'Sla*, and the Plaintiff Tribe's traditional, cultural, and religious use of *Ȟe Sápa* and *Pe'Sla*.

36.    Plaintiff Tribes asked the USFS to engage in government-to-government consultation to address their concerns with the Project, including the Project's impacts on *Ȟe Sápa* and *Pe'Sla*.

37.    For example, Plaintiff Cheyenne River Sioux Tribe asked the USFS to engage in government-to-government consultation at *Pe'Sla* to enable the USFS to grasp the importance of the sacred site to the tribes. The Cheyenne River Sioux Tribe also asked the USFS to engage in government-to-government consultation with the Cheyenne River Sioux Tribal Council, the governing body of the Tribe, at a meeting of the Tribal Council on the Cheyenne River Indian Reservation.

38.    Plaintiff Lower Brule Sioux Tribe asked the USFS to engage in government-to-government consultation with the Lower Brule Sioux Tribal Council, the governing body of the Tribe, at the Tribe's government headquarters on the Lower Brule Indian Reservation.

39.    Plaintiff Oglala Sioux Tribe asked the USFS to engage in government-to-government consultation with the Oglala Sioux Tribal Council, the governing body of the Tribe, at a special meeting of the Tribal Council on the Pine Ridge Indian Reservation, in accordance with the Tribe's laws on intergovernmental consultation.

40.    The USFS did not honor Plaintiff Tribes' requests for consultation or otherwise engage in meaningful, mutual, and legally required government-to-government consultation with Plaintiff Tribes, as required by federal law, including among other things Section 106 of the NHPA and its implementing regulations at 36 C.F.R. Part 800, NEPA and its implementing regulations at 40 C.F.R. Part 1501, including 40 C.F.R. §§ 1501.2 and 1501.7, the Council on Environmental Quality's Memorandum for Heads of Federal Agencies on the Designation of Non-Federal Agencies to Be Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act (Jul. 28, 1999), Executive Order 13,007 (May 24, 1996), Executive Order 13,175 (Nov. 6, 2000), the USDA's Departmental Regulation on Tribal Consultation, No. DR 1350-002 (Apr. 30, 2024), and the USDA's Action Plan on Tribal Consultation and Strengthening Nation-to-Nation Relationships (Apr. 26, 2021).

41.    Government-to-government consultation was, and still is, necessary to prevent significant and irreparable harms to *Ȟe Sápa* and *Pe'Sla*; to prevent significant and irreparable harms to Plaintiff Tribe's use of those lands for traditional, cultural, and religious purposes; to ensure the USFS performs a comprehensive survey of all traditional, cultural, and religious resources that are present at and around the proposed exploration area; and to ensure that the USFS includes the Plaintiff Tribes and their cultural and natural resource experts in that comprehensive survey.

42.    The cultural resource survey conducted in connection with the Project was inadequate. There is no indication that any of the archaeologists had the knowledge or experience necessary to identify *Lakota, Nakota,* and *Dakota* cultural resources. More importantly, it does not appear that any *Lakota, Nakota,* or *Dakota* THPO's or *Lakota, Nakota,* or *Dakota* cultural resources experts were involved in the survey or field work.

**The PLS Rochford Mineral Exploratory Drilling Project**

43.     On February 27, 2026, the USFS issued its Decision approving the Project.

44.     As approved by the Decision, the Project will result in "drilling boreholes at up to 18 proposed sites on NFS lands. Each drill site would be approximately 30 feet x 50 feet, or 0.034 acre in size.  There would be one borehole at each site. … The maximum depth of each borehole would be 1,000." Decision at 3.  Some of the drill boreholes will be drilled diagonally. "Additionally, there would be two 0.15-acre laydown/staging areas used to store core boxes, hose, spare parts, water storage tanks, and site portable sanitation facilities." Decision at 3.

45.     "Access to drill sites would rely on existing National Forest System roads (NFS) or temporary access routes and overland two-track routes wherever feasible, specifically NFS roads 190 and 125 for northern sites and NFS road 132 for southern sites.  To reach pads from those roads, the proponent would implement approximately 5,050 feet of temporary overland access route improvements." Decision at 3. This includes developing new roads and tearing up existing vegetation.

46.     Primary access to the proposed drill sites will be along Rochford Road and South Rochford Road, which runs right through the center of tribally owned lands at *Pe'Sla*. PoO, Figure 1. The transport of industrial equipment along this primary access route will increase traffic, dust, noise, risk of wildfire, risk of hazardous materials spills, risk of wildlife impacts/fatalities and increased disruption of the cultural and ceremonial activities associated with the Pe'Sla site.

47.     "Upon completion of drilling, all temporary access routes would be restored to pre-project conditions or as near as practicable, including recontouring, surface scarification,

redistribution of salvaged topsoil and woody debris, and reseeding with a certified weed free seed mix approved by the Forest Service." Decision at 3.

48.     "Drilling would be supplied with water from an approved municipal or industrial source trucked to the site.  Water would be recirculated during drilling through either in-ground infiltration galleries (excavated trenches typically 2–4 feet deep, approximately 24 inches wide, up to 20 feet long) or above-ground sump systems (double-tank or double-crib systems lined with oil-impermeable fabric), which allow cuttings and fines to settle and clarified water to be returned to the drill." Decision at 3.

49.     "Project equipment will include one to three track or trailer mounted drill rigs; a water truck; pickup support vehicles; all terrain/utility vehicles; and, on an as needed basis, a compact track loader or backhoe for infiltration galleries and minor pad grading, and a small dozer or skid steer for access maintenance and reclamation." Decision at 4.

50.     "Drilling operations are expected to occur over less than one year from initiation, with work typically conducted on two 12-hour shifts (up to 24-hour operations if needed to meet schedule and subject to any timing restrictions).  The maximum potential surface disturbance for the updated plan comprises approximately .6 acres for drill pads, approximately 1.8 acres for new temporary overland access routes (5,050 feet at 15 feet wide), and approximately 0.3 acre for laydown areas, for a combined estimate of less than 3 acres." Decision at 4.

51.     "All disturbed areas will be reclaimed concurrently where practicable and immediately following completion of use at each site.  Operations will adhere to seasonal constraints and resource protection measures identified during the NEPA review and Section 7 consultation (e.g., restrictions near mapped bat hibernacula and potential bat maternity roost habitat), as well as Forest Service locatable minerals regulations (36 C.F.R. 228, Subpart A), the

11

Black Hills National Forest Plan standards and guidelines, and applicable state and federal water quality and noxious weed management requirements." Decision at 4.

52.     The Decision states that: "All sites will be reclaimed following drilling activities. Project activities, including reclamation, will take one year or less." Decision at 4.

53.     That is factually and legally incorrect. The PoO, approved in the Decision, acknowledges that reclamation will not be completed for at least 3 years, as ongoing monitoring, and potential "modifications to the site" will occur on a yearly basis. PoO at 14; Decision at 17.

54.     The Decision further acknowledges that operations, including the required reclamation, will continue for at least 3 years:

> PLS will commit to annual field inspections of drill sites and the lay-down area in conjunction with Forest Service and SD DANR staff (whenever possible) to cover areas used and occupied by PLS under this PO to monitor for reclamation effectiveness and noxious weed infestations for 3 years. Such field inspections will be documented with photographs or written descriptions. Field inspection information will be compiled at the end of each field season and provided to the Forest Service.

> If the above reclamation efforts do not meet the established criteria required for bond release, PLS will collaborate with a Forest Service representative and *make modifications to the site, incorporating such changes and additional procedures as may be expected to provide reclamation to the stated standard*.

Decision at 17 (emphasis added).

55.     In addition, the USFS will not release the required reclamation bond until PLS has demonstrated that these reclamation requirements and standards have been met, after the 3 year "monitoring" and site "modifications" have been completed.

56.     As the agency admitted: "Remaining reclamation bond will be held in order to monitor onsite and off-site damage to the environment and forest surface resources for three years to ensure proper revegetation and weed control." Decision at 17.

57.     The PoO states the same requirements:

Reclamation Bond Release
Release of the reclamation bonds for a specific drill site will be requested when:
1) Monitoring indicates that reclamation measures have effectively prevented or controlled onsite and off-site damage to the environment and forest surface resources for three years and such prevention is expected to continue.
2) Re-vegetation at reclaimed areas is adequate. Re-vegetation will be deemed adequate when:
   a. Species composition is like that of adjacent areas; and
   b. The vegetative crown cover is 60 to 75 percent of the existing percent vegetative crown cover of adjacent areas not disturbed by operations authorized by this Plan.

PoO at 14.

## **The Project's Significant Impacts on *Ȟe Sápa* and *Pe'Sla***

58.     *Ȟe Sápa* and *Pe'Sla* are within the zone of interest and the area that will be disturbed and harmed by the Project.

59.     The Project will result in significant disturbance and harm to *Ȟe Sápa* and *Pe'Sla*, including significant disturbance and harm to the lands in and adjacent to *Pe'Sla* that contain the roads, drill sites, and support facilities to be used in connection with the Project.

60.     The Project will disturb and harm historic, archaeological, and cultural sites at *Ȟe Sápa* and *Pe'Sla*, the lands, water, natural resources, and fish and wildlife at *Ȟe Sápa* and *Pe'Sla*, and the Plaintiff Tribe's traditional, cultural, and religious use of *Ȟe Sápa* and *Pe'Sla*.

61.     The Project will disturb and disrupt Plaintiff Tribes' ceremonial activities and youth camps at *Pe'Sla*, and it will desecrate *Ȟe Sápa* and *Pe'Sla*.

62.     Drilling, mining, and industrial activity in close proximity to *Pe'Sla* and the traffic of heavy vehicles, equipment, and material through *Pe'Sla* will disrupt the traditional, cultural, religious, ceremonial, educational, and tribal leadership activities that take place there. Twenty-four-hour, round-the-clock Project activities involving heavy equipment operations, land disturbance, hauling dirt and other material, and constructing and reconstructing roads, among

other things, will create excessive noise, vibration, visual disturbances, and desecration of sacred lands. Project activities will disrupt the peaceful and undisturbed use of *Pe'Sla* by Plaintiff Tribes and their members.

63.    The USFS failed to adequately assess the Project's impacts on *Ȟe Sápa* and *Pe'Sla* as sacred sites and its impacts on the extensive traditional, cultural, and religious properties in the area, the pristine quality of the land and water in *Ȟe Sápa*, *Pe'Sla*, and the Rapid Creek headwaters area, and open aquifer and domestic water sources, including Pactola Reservoir, which provides municipal and domestic water for Rapid City.

#### The USFS Failed to Include *Pe'Sla* in the Area of Potential Effects

64.    The USFS was obligated to include *Pe'Sla* and surrounding lands, including the 2-mile-wide buffer zone recognized in the Great Sioux Nation Tribes-USFS MOU, in the "area of potential effects" ("APE") for its NHPA analysis and its finding of "[h]istoric properties affected" under 36 C.F.R. § 800.4(d)(2).

65.    The NHPA established a national preservation program to protect historic properties as a cooperative effort between the federal government and states, local governments, Tribes, Native Hawaiian organizations, and private organizations. 54 U.S.C. § 300101.

66.    Section 106 of NHPA requires federal agencies to consider the impact of their actions on historic properties. 54 U.S.C. § 306108. In that process, the agency must determine the APE, which is the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties. 36 C.F.R. § 800.16(d).

67.    The agency must then determine whether the project will affect any historic properties within the APE. 36 C.F.R. § 800.4. An "effect" is defined as an alteration to the

characteristics of a historic property qualifying it for inclusion in the National Register. Id. § 800.16(i).

68.    If the agency concludes that a historic property will be affected, it must then determine whether the effects are adverse. 36 C.F.R. § 800.5. Effects are adverse if the proposal "may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(a)(1).

69.    If adverse effects are found, then the agency must explore measures to avoid, minimize, or mitigate adverse effects on historic properties and reach a written agreement with the State Historic Preservation Officer ("SHPO") or THPO on measures to resolve them. 36 C.F.R. § 800.6.

70.    Federal agencies "shall" consult with any Tribe that "attaches religious and cultural significance" to a historic property affected by an undertaking. 54 U.S.C. § 302706(b); 36 C.F.R. § 800.2(c)(2)(ii). This consultation must recognize the government-to-government relationship between the federal government and tribes and give tribes the opportunity to "advise on the identification and evaluation of historic properties, including those of traditional religious and cultural importance" and "participate in the resolution of adverse effects." 36 C.F.R. § 800.2(c)(2)(ii).

71.    The NHPA required Defendants to identify the Project's effects on "any historic property," 54 U.S.C.A. § 306108, within the Project's APE, 36 C.F.R. § 800.16(d).

72.    Defendants' obligations under the NHPA apply to *Pe'Sla* and the surrounding area, including the 2-mile buffer zone recognized in the Great Sioux Nation Tribes-USFS MOU.

*Pe'Sla* is a recognized TCP as a historic property "that is eligible for inclusion in the National Register because of its association with cultural practices or beliefs of a living community that (a) are rooted in that community's history, and (b) are important in maintaining the continuing cultural identity of the community." National Park Service, U.S. Dept. of the Interior, *National Register Bulletin 38: Guidelines for Evaluating and Documenting Traditional Cultural Properties*, 1 (1998).

73.    Plaintiff Tribes, other tribes, and tribal members, submitted voluminous comments, detailing the significant impacts of the Project on *Pe'Sla* and the surrounding cultural landscape.

74.    Yet, Defendants based their Decision and Project approval on an unsupported and factually incorrect conclusion that: "There are no known Native American or Alaska Native religious or cultural sites within the project area." Decision at 20.

75.    The Project will adversely and significantly affect cultural and religious uses of *Pe'Sla* and its surrounding landscape by Plaintiff Tribes, their members, and others. At a minimum, the noise from the constant drilling will reverberate across the landscape, adversely affecting the ongoing and recognized ceremonial, cultural and religious uses of the protected *Pe'Sla* lands.

76.    The USFS failed to include *Pe'Sla* and the surrounding area, including the 2-mile buffer zone recognized in the Great Sioux Nation Tribes-USFS MOU, in the APE for its required NHPA analysis, government-to-government consultation, and finding of historic properties affected.

16

## The Project's Impacts Are an "Extraordinary Circumstance" Disqualifying the Use of a Categorical Exclusion

77.     Defendants did not prepare an environmental impact statement ("EIS") or environmental assessment ("EA") for the Project, as required by NEPA for proposed agency actions that significantly affect the quality of the human environment ( requiring an EIS) or whose effect on the human environment is uncertain (requiring an EA). *See* 42 U.S.C. §§ 4332(2)(C) and 4336(b)(2).

78.     Instead, in the Decision, the USFS utilized the CE in Category 220.6(e)(8), which is limited to "[s]hort-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities," 36 C.F.R. § 220.6(e)(8), *repromulgated as* 7 C.F.R. § 7.1.b.4(d)(32), and the USFS categorically excluded the Project from further review or analysis under NEPA, including the preparation of an EIS or EA.

79.     The USFS may not use a CE when the potential effects of a proposed agency action are certain to be insignificant, and scoping does not reveal otherwise or raise uncertainty concerning the effects of the proposed agency action on the human environment. *See* Forest Service NEPA Handbook ("FSH"), FSH § 1909.15, Chapter 31.3. The determination of the significance of the potential effects requires USFS to consider the direct, indirect, and cumulative effects and impacts of past, present, and reasonably foreseeable future actions. *See* FSH 1909.5, Chapter 31.3.

80.     In addition, where "extraordinary circumstances" are present and may be affected, an agency may not invoke a CE and USFS must prepare an EA or EIS instead. 36 C.F.R. §220.6(a) and (b); 7 C.F.R. § 1b.3(f).

81.     The USFS has developed criteria specifying resource conditions that must be considered in determining whether "extraordinary circumstances" related to a proposed action

17

make the use of a CE inappropriate and whether the proposed action warrants further analysis in an EA or EIS.  36 C.F.R. §220.6(a) and (b); FSH § 1909.15, Chapter 31.2.

82.    For this case, the critical "extraordinary circumstances" that must be considered by the USFS before using a CE include, but are not limited to, consideration of the impacts to "American Indians and Alaska Native religious or cultural sites." 36 C.F.R. §220.6(b)(1)(vi). Similarly, the new CE rules state: "The resources to screen for in the potentially affected environment when considering extraordinary circumstances may include, but are not limited to: …. sites … of historic… significance, as designated by Federal, Tribal, State, or local governments, or property eligible for listing on the National Register of Historic Places." 7 C.F.R. §7.1b.3(f)(1)(vii).

83.    *Ȟe Sápa* and *Pe'Sla* are sites to which the "extraordinary circumstances" requirements apply.

84.    Plaintiff Tribes, tribal members, and non-governmental organizations informed the USFS of the significant impacts the Project would have on *Ȟe Sápa* and *Pe'Sla*.

85.    Despite this, the USFS based its CE on an unsupported statement that: "There are no known Native American or Alaska Native religious or cultural sites within the project area." Decision at 20.

86.    This is wrong as a factual matter, as the Project will adversely and significantly affect *Ȟe Sápa* and *Pe'Sla* and their uses by Plaintiff Tribes and their members.

87.    The USFS's refusal to consider the impacts to *Ȟe Sápa* and *Pe'Sla* contradicts its commitment to Plaintiff Tribes to protect these lands, including a 2-mile-wide buffer zone around *Pe'Sla*, as set forth in the 2024 MOU between the USFS and Great Sioux Nation Tribes.

18

88.    The Project is within the 2-mile-wide buffer around *Pe'Sla* zone that is identified in the MOU.

89.    The test for whether there may be "extraordinary circumstances" is not limited to the actual Project footprint, as USFS maintains.  Rather, "When applying categorical exclusions, USDA subcomponents [USFS] *shall consider relevant resources in the potentially affected environment for which an extraordinary circumstance may exist* that would require the action to instead be documented in an environmental assessment (when there is uncertainty regarding the degree of effect) or an environmental impact statement (if it is determined there is a reasonably foreseeable significant impact)." 7 C.F.R. § 1b.3(f) (emphasis added).

90.    The USFS failed to analyze the Project's impacts to the "potentially affected environment," which necessarily includes impacts to Pe'Sla and associated lands and resources.

91.    The agency's self-imposed limit of its "extraordinary circumstances" analysis to just the "project area," and not the Project's access routes, ignores the agency's mining regulations which consider all access roads as part of the Project "operations."  36 C.F.R. § 228.3(a) (defining "operations" as "including roads and other means of access.").

92.    The USFS's failure to consider the impacts to *Pe'Sla* outside of the limited "project area," renders its Decision arbitrary and capricious and not in compliance with NEPA and its implementing regulations. Those impacts include the noise disturbance caused by the transport of Project-related vehicles, equipment, and material on South Rochford Road, right through the middle of *Pe'Sla*.

### Project Operations Will Extend Beyond One Year, Disqualifying the Project from the Categorical Exclusion for "Short-Term" Mineral Investigations

93.    The USFS relied upon CE-8 for "Short-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities that may require cross-country

travel by vehicles and equipment, construction of less than 1 mile of low standard road, or use and minor repair of existing roads." 36 C.F.R. §220.6(e)(8) ("CE-8"), *repromulgated at* 7 C.F.R. §7.1.b.4(d)(32).

94.     According to the PoO, as approved by the Decision, Project operations will not be completed within one-year, since reclamation will take at least three years to complete.

95.     Reclamation is required for approved mineral exploration projects, and it includes rehabilitation and restoration of public lands as follows:

> [O]perator shall, where practicable, reclaim the surface disturbed in operations by taking such measures as will prevent or control onsite and off-site damage to the environment and forest surface resources including:
> (1) Control of erosion and landslides;
> (2) Control of water runoff;
> (3) Isolation, removal or control of toxic materials;
> (4) Reshaping and revegetation of disturbed areas, where reasonably practicable; and
> (5) Rehabilitation of fisheries and wildlife habitat.

36 C.F.R. §228.8(g). *Accord*, USDA Forest Service, *Anatomy of a Mine, From Prospect to Production*, General Technical Report INT-GTR-35 at 68-69 (Feb. 1995).

96.     Reclamation is part of the mineral exploration "operations" proposed by PLS. 36 C.F.R. § 228.3(a).  All aspects of the Project, including monitoring and reclamation, are considered part of the authorized "operation."  The regulations define "operations" as "[a]ll functions, work and activities in connection with prospecting, exploration, development, mining or processing of mineral resources and all uses reasonably incident thereto." 36 C.F.R. § 228.3.

97.     PLS admits that the required reclamation will not be completed within the one-year limit:

> PLS will commit to annual field inspections of drill sites and the lay-down area in conjunction with USFS and SD DANR staff (whenever possible) to cover areas used and occupied by PLS under this Plan of Operations to monitor for reclamation effectiveness and noxious weed infestations for 3 years.  Such field

20

inspections will be documented with photographs or written descriptions.  Field inspection information will be compiled at the end of each field season and provided to the USFS.

If the above reclamation efforts do not meet the established criteria required for bond release, PLS will collaborate with the USFS representative and make modifications to the site, incorporating such changes and additional procedures as may be expected to provide reclamation to the stated standard.

PoO at 14.

98.     PLS acknowledges that the required revegetation can only occur in the proper season, which could result in work done after the one-year limit.  "Re-vegetation will be accomplished as soon as possible; however, will be performed in the proper season in accordance with accepted agricultural and reforestation practices identified in consultation with USFS personnel on a site-specific basis." PoO at 14.

99.     The Decision also admits that the required reclamation will not be completed within the one-year limit: "All areas of ground disturbance would be monitored for noxious weeds and *treated for two to three years post-disturbance* following Forest Service standards for treatment methods." Decision at 11 (emphasis added).

100.    In addition, under USFS mining regulations, PSL is required to submit a "reclamation cost estimate/financial assurance" (or bond). 36 C.F.R. §228.13.

101.    PLS admits that it will not request release of the reclamation bond until three years of monitoring and reclamation is completed:

Release of the reclamation bonds for a specific drill site will be requested when: Monitoring indicates that reclamation measures have effectively prevented or controlled onsite and off-site damage to the environment and forest surface resources for three years and such prevention is expected to continue.

PoO at 14.

21

102.    Thus, whether or not drilling finishes in one year, Project operations "in connection with" and "reasonably incident" to the actual exploration (as defined in 36 C.F.R. §228.3(a)) will not be completed until up to three years or more after drilling is completed.  As such, the Project operations, taken as a whole, as mandated by the agency regulations, does not meet the "1 year or less" requirement of the CE utilized by the agency here.

103.    The use of the "short-term" mineral investigation CE under these circumstances was held illegal in *Defenders of Wildlife v. U.S. Forest Service*, Order, 4:14-cv-02446-RM (D. Ariz. 2015).  On very similar facts, the federal court held that since monitoring of reclamation success would last three years, and that reclamation based on that monitoring "may be required during the three-year monitoring period," the situation here, the agency could not use the "short-term" mineral exploration category for a proposed mineral exploration project.

104.    "Defendants argue that this three-year monitoring period should not be considered part of the Project's duration because all ground-disturbing Project activities will be completed before the monitoring period begins; however, the Decision Memorandum anticipates that additional ground disturbing reclamation activities may be required during the three-year monitoring period.  USFS's determination that the project can be completed in one year or less is unsupported by the record." *Defenders*, Order at 8.

105.    In an attempt to avoid the one-year limit, the Decision asserts that "[i]f project activities must extend beyond that time, additional environmental analysis would be necessary." Decision at 4.

106.    Yet, that attempt to fit the Project under the one-year limit was squarely rejected by the court in *Defenders*.  "USFS argues that, if additional reclamation work is required during the three-year monitoring period, the additional reclamation work would be reviewed under

NEPA. However, the reclamation work is already contemplated in and authorized by the Decision Memorandum, with no indication in the record that the already-approved reclamation design features would require a new Plan of Operations or further review and approval." Order at 8, n.5.

107. "Therefore, USFS's approval of the project using the categorical exclusion for short-term mineral explorations pursuant to 36 C.F.R. §220.6(e)(8) was arbitrary and capricious." Order at 8.

108. Similarly, in vacating the Forest Service's attempt to avoid the one-year limit in CE-8 by designating the post-drilling reclamation as a separate project, the Ninth Circuit recently confirmed that the post-drilling reclamation monitoring and potential work are part of project "operations," and must be counted in determining whether the Project can be completed within the one-year limit in 36 C.F.R. §220.6(e)(8).

> Forest Service's mineral regulations, which establish that *reclamation cannot be bifurcated from other mineral exploration efforts*. Specifically, the mineral regulations govern mineral exploration "operations." 36 C.F.R. pt. 228.3(a). Operations encompass "[a]ll functions, work, and activities in connection with" mineral exploration. § 228.3(a). This definition necessarily includes reclamation because mineral operations are required under § 228.8 to meet certain environmental protection procedures, including revegetation and wildlife habitat rehabilitation. § 228.8(g). In fact, operators must submit a "proposed plan of operations" to the Forest Service that describes "measures to be taken to meet the requirements for environmental protection in § 228.8," § 228.4(c)(3), and the Forest Service must then review the plan's environmental impact, §§ 228.4(a)(4), (b), 228.5(a)–(b). The Forest Service thus necessarily reviews mineral exploration and reclamation as a single proposed project.

*Friends of the Inyo v. U.S. Forest Service*, 103 F.4th 543, 552 (9th Cir. 2024) (emphasis added).

109. Because the required reclamation operations in this case will last more than one year, the Project does not qualify for the relied-upon CE category and the agency's decisions violate NEPA and its implementing regulations.

23

110.    Plaintiff Tribes and their members have been, and are being, irreparably harmed by the USFS's failure to conduct the required NEPA review and analysis, including preparation of an EA or EIS, and the USFS's failure to involve Plaintiff Tribes, their members, and the public in the required NEPA review process.  The USFS's action is not fully informed and overlooks serious cultural and environmental impacts that would have been brought to its attention had the agency completed the required process, including fully soliciting public input and considering environmental impacts and alternatives.

<u>**COUNT I: FAILURE TO CONSULT WITH PLAINTIFF TRIBES**</u>

111.    Plaintiff Tribes reallege and incorporate by reference the allegations in all preceding paragraphs.

112.    Plaintiff Tribes and their members attach religious and cultural significance to the BHNF, *Ȟe Sápa*, and *Pe'Sla*.

113.    Defendants' actions, including their decision not to engage in meaningful, mutual, and legally required government-to-government consultation with Plaintiff Tribes and their Decision to approve the Project without engaging in such consultation, violate federal law, including NEPA and its implementing regulations, NHPA and its implementing regulations, and other federal laws, regulations, and policies identified herein. Those actions are arbitrary, capricious, not in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

114.    Defendants' violation of law prejudices and adversely affects Plaintiff Tribes' rights and interests.

24

## COUNT II: ERRONEOUS FINDING THAT NO HISTORIC PROPERTIES WILL BE AFFECTED BY THE PROJECT

115.    Plaintiff Tribes reallege and incorporate by reference the allegations in all preceding paragraphs.

116.    Defendants' erroneous and narrow definition of the Project's area of potential effects ("APE"); their failure to engage in meaningful, mutual, and legally-required government-to-government consultation on the Project's effects on *Pe'Sla* and surrounding lands, including the 2-mile buffer zone recognized in the Great Sioux Nation Tribes-USFS MOU, all of which should have been included within the APE; their subsequent finding of "[n]o historic properties affected"; their Project approval; and the Decision violate the NHPA and its implementing regulations and policies and are arbitrary, capricious, not in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. §706.

117.    Defendants' violation of law prejudices and adversely affects Plaintiff Tribe's rights and interests.

## COUNT III: IMPROPER USE OF CATEGORICAL EXCLUSION DESPITE "EXTRAORDINARY CIRCUMSTANCES"

118.    Plaintiff Tribes reallege and incorporate by reference the allegations in all preceding paragraphs.

119.    The Project's significant effects on *Ȟe Sápa* and *Pe'Sla* represent an "extraordinary circumstance," precluding the use of a CE.

120.    Defendants' Decision is unsupported by the record and violates NEPA and its implementing regulations and policy.

121.    Defendant's Decision and actions, including its decision not to prepare an EA or EIS, violates NEPA and its implementing regulations and policies and is arbitrary, capricious, not

25

in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

122.    Defendant's violation of law prejudices and adversely affects Plaintiff Tribes' rights and interests.

## COUNT IV: IMPROPER USE OF CATEGORICAL EXCLUSION FOR "SHORT-TERM" MINERAL INVESTIGATIONS

123.    Plaintiff Tribes reallege and incorporate by reference the allegations in all preceding paragraphs.

124.    In issuing the Decision and approving the exploration Project, Defendants inappropriately and illegally relied on a categorical exclusion applying to "short-term (1 year of less) mineral, energy, or geophysical investigations and their incidental support activities," 36 C.F.R. § 220.6(e)(8); 7 C.F.R. § 1b.4(d)(32), to exclude the exploration Project from further NEPA review.  The Project's drilling, road construction, reclamation, monitoring and mitigation, and all incidental support activities will take more than one year to complete, rendering the use of the "short term" mineral investigation CE inapplicable.

125.    Defendants' actions, including their decision not to prepare an EA or EIS, violates NEPA and its implementing regulations and policies and are arbitrary, capricious, not in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. § 706.

126.    Defendants' violation of law prejudices and adversely affects Plaintiff Tribes' rights and interests.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Declare that Defendants violated federal law, including the APA, NEPA, and NHPA and their implementing regulations and policies, in issuing its Decision Memo and Project approvals.

B.     Reverse, set aside, and vacate Defendants' Decision and authorization of the Project.

C.     Enjoin Defendants, their agents, servants, employees, and all others acting in concert with them, or subject to their authority or control, from proceeding with any aspect of the Project, pending full compliance with the requirements of law.

D.     Award Plaintiff Tribes their reasonable attorney's fees and costs incurred in this action pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, NHPA, 54 U.S.C.A. § 307105, or other provisions of law.

E.     Grant Plaintiff Tribes such injunctive and additional relief as the Court deems just and equitable or as Plaintiff Tribes may hereinafter request.

27

Respectfully submitted this 30th day of April, 2026.


By:   /s/ Steven J. Gunn
Steven J. Gunn
1301 Hollins Street
St. Louis, MO 63135
Telephone: (314) 920-9129
Facsimile: (800) 520-8341
Email: sjgunn@wustl.edu; sjgunn37@gmail.com

*Attorney for Plaintiffs Cheyenne River Sioux Tribe,
Lower Brule Sioux Tribe, Oglala Sioux Tribe, and
Yankton Sioux Tribe*


By:   _____
Mark C. Van Norman
1711 Harmony Heights Lane, No. 101
Rapid City, SD 57702
Telephone: (202) 262-8418
Email: mcvnconsulting@gmail.com

*Attorney for Plaintiffs Cheyenne River Sioux Tribe,
Crow Creek Sioux Tribe, Lower Brule Sioux Tribe,
Santee Sioux Tribe, Sisseton-Wahpeton Oyate, Spirit
Lake Sioux Tribe, Standing Rock Sioux Tribe, and
Yankton Sioux Tribe*

Kimberly Craven, AZ Bar # 023163
Attorney General
Payton Scott, GA Bar # 104899
Assistant Attorney General
Cheyenne River Sioux Tribe
P.O. Box 590
Eagle Butte, SD 57625
Telephone: (605) 218-2346
Email: crstattorneygeneral@protonmail.com;
    payton.scott@crstmail.com
*Pro Hac Vice Motions to Be Submitted*

*Attorneys for Cheyenne River Sioux Tribe*

28

## **CERTIFICATE OF SERVICE**

I certify that on April 30, 2026, I caused a true and accurate copy of the foregoing to be served by electronic mail on Krystal Rose-Perez, who is the attorney for Defendants U.S. Forest Service, U.S. Department of Agriculture, and James Gubbels in a related case captioned *NDN Collective, et al. v. U.S. Forest Service, et al.*, Case No. 5:26-cv-05035-CCT (D.S.D.), and such electronic service was made at the following address:

Krystal Rose-Perez
U.S. Department of Justice
150 M Street
Washington, D.C. 20002
Email: krystal-rose.perez@usdoj.gov

        /s/ Steven J. Gunn

29

JS 44   (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

See attached list of plaintiffs.

**DEFENDANTS**

U.S. Forest Service, U.S. Dept. of Agric., James Gubbels

**(b)** County of Residence of First Listed Plaintiff   Dewey and Ziebach
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attached list of lawyers.

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [ ] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*                        Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane   **PERSONAL INJURY** [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability   Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel &   [ ] 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | Slander   Pharmaceutical Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers'   Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability   [ ] 368 Asbestos Personal [ ] 340 Marine   Injury Product [ ] 345 Marine Product   Liability | | [ ] 835 Patent - Abbreviated New Drug Application [ ] 840 Trademark | [ ] 460 Deportation [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | Liability   **PERSONAL PROPERTY** [ ] 350 Motor Vehicle   [ ] 370 Other Fraud | **LABOR** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle   [ ] 371 Truth in Lending | [ ] 710 Fair Labor Standards Act | | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract | Product Liability   [ ] 380 Other Personal | [ ] 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal   Property Damage | Relations | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | Injury   [ ] 385 Property Damage | [ ] 740 Railway Labor Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
| | [ ] 362 Personal Injury -   Product Liability Medical Malpractice | [ ] 751 Family and Medical Leave Act | [ ] 863 DIWC/DIWW (405(g)) [ ] 864 SSID Title XVI | Exchange [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights   **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting   **Habeas Corpus:** | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment   [ ] 463 Alien Detainee | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/   [ ] 510 Motions to Vacate Accommodations   Sentence | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities -   [ ] 530 General | | | Agency Decision |
| [ ] 290 All Other Real Property | Employment   [ ] 535 Death Penalty [ ] 446 Amer. w/Disabilities -   **Other:** | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| | Other   [ ] 540 Mandamus & Other [ ] 448 Education   [ ] 550 Civil Rights [ ] 555 Prison Condition [ ] 560 Civil Detainee - Conditions of Confinement | [ ] 462 Naturalization Application [ ] 465 Other Immigration Actions | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
National Historic Preservation Act, National Environmental Policy Act, Administrative Procedures Act

Brief description of cause:

**VII. REQUESTED IN COMPLAINT:**

[ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   [ ] Yes   [ ] No

**VIII. RELATED CASE(S) IF ANY**       *(See instructions):*

JUDGE   Hon. Camela C. Theeler

DOCKET NUMBER   5:26-cv-05035-CCT

DATE
04/29/2026

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|
| | | | | |

## CIVIL COVER SHEET ATTACHMENT

List of Plaintiffs:

1. Cheyenne River Sioux Tribe
2. Crow Creek Sioux Tribe
3. Lower Brule Sioux Tribe
4. Oglala Sioux Tribe
5. Santee Sioux Tribe
6. Sisseton-Wahpeton Oyate
7. Spirit Lake Sioux Tribe
8. Standing Rock Sioux Tribe
9. Yankton Sioux Tribe

List of Attorneys for Plaintiffs:

1. Steven J. Gunn
   1301 Hollins Street
   St. Louis, MO 63135
   Telephone: (314) 920-9129
   Email: sjgunn@wustl.edu; sjgunn37@gmail.com

   *Attorney for Cheyenne River Sioux Tribe, Lower Brule Sioux Tribe, Oglala Sioux Tribe, and Yankton Sioux Tribe*

2. Mark C. Van Norman
   1711 Harmony Heights Lane, No. 101
   Rapid City, SD 57702
   Telephone: (202) 262-8418
   Email: mcvnconsulting@gmail.com

   *Attorney for Cheyenne River Sioux Tribe, Crow Creek Sioux Tribe, Lower Brule Sioux Tribe, Santee Sioux Tribe, Sisseton-Wahpeton Oyate, Spirit Lake Sioux Tribe, Standing Rock Sioux Tribe, and Yankton Sioux Tribe*

3. Kimberly Craven, AZ Bar # 023163 – *Pro Hac Vice Motions to Be Submitted*
   Attorney General
   Payton Scott, GA Bar # 104899 - *Pro Hac Vice Motions to Be Submitted*
   Assistant Attorney General
   Cheyenne River Sioux Tribe
   P.O. Box 590
   Eagle Butte, SD 57625
   Telephone: (605) 218-2346
   Email: crstattorneygeneral@protonmail.com; payton.scott@crstmail.com

   *Attorneys for Cheyenne River Sioux Tribe*